**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-142 (CJN)** |
| **v.** | : | |
| | : | |
| **SAMUEL FISHER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Samuel Fisher to 120 days of incarceration to be served consecutively to his current state sentence; to one year of supervised release; to 60 hours of community service; and to $500 in restitution.

I.    **Introduction**

On January 6, 2021, Defendant Samuel Fisher, then a 32-year-old lifestyle and dating coach who went by the alias Brad Holiday, participated in the attack on the United States Capitol— a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]    Although the Statement of Offense in this matter, filed on July 6, 2022 (ECF No. 30 at 2), reflects a sum of more than $1.4 million dollars for repairs, the losses suffered as a result of the siege at the United States Capitol are currently estimated to be $2.7 million.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Fisher pleaded guilty to one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).  As explained herein, a sentence of 120 days of incarceration is appropriate in this case because (1) in the weeks leading up to January 6, 2021, Fisher glorified and promoted political violence, both in Facebook messages and on his website; (2) Fisher traveled to Washington, D.C. in early January 2021 with the intent of impeding the certification of the Electoral College and with reason to believe that the events at the Capitol would turn violent; (3) Fisher brought at least two firearms—an AR-15 semi-automatic rifle and a pistol—on his trip to the Washington, D.C. area (though he apparently did not bring the firearms into Washington, D.C. or to the Capitol); (4) in the evening hours of January 5, 2021, Fisher sent another Facebook user a photograph of those firearms in the course of discussing his plan for the following day; (5) in the early hours of January 6, 2021, Fisher posted on his website that "Trump just needs to fire the bat signal … deputize patriots … and then the pain comes"; (6) on January 6, after attending the "Stop the Steal" rally, Fisher entered the Capitol building and traveled among a large crowd to the Rotunda before exiting approximately 15 minutes later; and (7) in the days following the January 6 attack, Fisher used social media to glorify the political violence that occurred at the Capitol and boast about his own participation in the riot.

The Court must also consider that Fisher's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  *See United States v. Thomas Fee*, No. 1:21-cr-133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution.  And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country.  I cannot ignore that,

cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, No. 1:21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts and circumstances of Fisher's crime support a sentence of 120 days of imprisonment.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary repetition, the government refers to the general summary of the attack on the Capitol reflected in the Statement of the Offense submitted in connection with Fisher's guilty plea.  *See* ECF No. 30 (Statement of Offense), at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop, we turn to Fisher's conduct in connection with the January 6 attack.

### Fisher's Role in the January 6, 2021 Attack on the Capitol

A.     In late 2020 and early 2021, Fisher lived in New York, where he ran a business as a lifestyle and dating coach under the alias Brad Holiday.  The defendant also operated a website (www.bradholiday.com), where he blogged and posted videos, as well as several Facebook accounts, under usernames "Brad Holiday," "Holiday Joseph Bradly," and "LuxLife Dating Coach."  Ex. 1-3.

In late December 2020, Fisher began sharing with other Facebook users his plans to travel to Washington, D.C. to protest the outcome of the 2020 Presidential Election on January 6, 2021.

On December 30, he wrote in a Facebook message, "im headed to dc on the 5th." *See, e.g.*, Ex. 4. Around the same time, he sent Facebook messages to another user saying, "I think there gonna be over a million patriots in DC" and "I'm going there … on the 6th." Ex. 5. A few days later, on January 3, in response to a request to take video on January 6 when "Real Patriots will fall upon the capital to protest," Fisher wrote, "Yea dude … I'm there … Just booked my Room." Ex. 6.

In other Facebook messages, Fisher also made clear that he was eager and ready for the events of January 6 to turn violent. On December 30, with his plans to travel to Washington, D.C. for January 6 taking shape, Fisher invited one of his Facebook friends to join him, suggesting that his friend come armed: "just march on DC on the 6th … [B]ring ur guns sr … I'll be there man … if you wanna roll with[.] [Y]ou have firearms? … [I]'d exercise my 2A legal rights there." Ex. 8. By then, Fisher had, indeed, acquired multiple firearms, including a semiautomatic AR-15 rifle and a shotgun, both of which Fisher had purchased a few months earlier. He had also posted videos on his website (www.bradholiday.com), in which he showcased firearms, firearm attachments, and other weapons, sometimes urging viewers to prepare for the upcoming "civil war":



https://bradholiday.com/?page_id=461 ("Olight Baldr Light and Laser Review") (last visited Sept. 29, 2022).



*Id.* ("Klarus Pickaninny Light Review") (last visited Sept. 29, 2022).



*Id.* ("Mossy Oak Overwatch Knife Review") (last visited Sept. 29, 2022).

B.      On or about January 4, Fisher drove from New York to the Washington, D.C. area. On January 5, he checked into an Airbnb in Hyattsville, Maryland, with plans to stay there for two nights.  In the evening of January 5, in response to a question "You in DC?", Fisher wrote in a series of Facebook messages:

> Yea[.] … I've been here for a day …  If millions of patriots don't show up with guns … Srs … [i]t could be over[.]  … I'm in some nasty air b n b in the Hood[.] … Haven't slept in 2 days basically[.] … Feel like shit and tmo they're gonna steal the election then I have to drive 10 Hours back home.

Ex. 9.  That same night, in response to the question "How long you're there till?", Fisher wrote: "[T]omorrow … unless i need to be here for longer[.]  [A]nxiety is high … haven't really slept in like 2-3 days."  Ex. 10.  In the same string of Facebook messages, Fisher then wrote, "Gotta make a stand man … Not gonna be intimidated."  Ex. 11.  When Fisher's counterpart asked whether "DC [is an] open carry state?", Fisher responded: "No … Not at all."  *Id.*  Despite that knowledge, Fisher agreed with his contact's suggestion to "stay heavy though."  *Id.*  Fisher then sent the same Facebook user the following photograph:



*Id.*  The sofa and pillow depicted in the picture's background match a sofa and pillow in the Hyattsville Airbnb where Fisher stayed on January 5, demonstrating that Fisher brought the firearms with him on the trip.  Fisher himself confirmed that he had come armed in a later message in the same thread: "I'm Going To the parking garage super early … Leaving shit in there maybe except pistol … And if it kicks off I got a Vest and My Rifle."  *Id.*

In the early hours of January 6, Fisher also took to his website (www.bradholiday.com) to lay out his plan for the following day in a public post entitled "January 6, 2021 Will Be the Most Historically Important Day of Our Lives":

> I am writing this from my Air B n B in Washington D.C. …
> Tomorrow, Trump and We The People will be betrayed again by
> every so called representative who said they'd fight for us.  Ted
> Cruz, Dan Crenshaw, all of these supposed hardcore
> constitutionalist republicans … all are compromised.  They will
> allow the steal to go on. … There's really three outcomes I forsee
> [sic] happening.
>
>> 1.  Trump has an Ace card up his sleeve.  He plays it.  The Deep
>>     State is arrested and hanged on the White House lawn for the
>>     High Treason. …
>>
>> 2.  Trump fails, Biden gets installed…  Patriots are ineffective
>>     and we live under the rule of the elite pedophiles and chinese
>>     communist party. …
>>
>> 3.  Trump fails, Biden gets installed…  Patriots show up in the
>>     millions with guns.  They execute all treasonous members of
>>     government and rebuild.
>
> Each of these, I believe are equally likely.  At the Stop The Steal
> rally today … I was disappointed at the lack of numbers of patriots.
> … If there are over 1 million patriots that show up tomorrow for
> trumps 11AM speech.  At 1 when congress certifies the election. …
> Trump just needs to fire the bat signal … deputize patriots … and
> then the pain comes.  1 Million Pissed off men with guns … bad
> idea.  We aren't looking to fight or hurt anyone … but the odds that
> this is going to be solved any other way … is next to nothing.

Ex. 12 (formatting altered).

      C.      On January 6, Fisher attended the "Stop the Steal" rally near the Ellipse, at which

President Trump spoke.  Fisher left the rally early, but then rejoined a large crowd as it made its

way toward the U.S. Capitol.  He was wearing blue jeans, a blue or gray shirt, a dark-colored

hooded jacket with a front zipper, a backpack, and sunglasses.

      By approximately 2:30 p.m., Fisher had entered the restricted grounds on the east side of

the U.S. Capitol:



At about 2:37 p.m., Fisher entered the Capitol building through the Memorial Door and, from there, made his way toward the Rotunda:





Ex. 13-14.  Fisher then spent several minutes walking around the Rotunda and the surrounding areas.  As he did so, he was repeatedly captured by the United States Capitol Police's closed-circuit surveillance system:









EX. 15-18.  Fisher exited the Capitol building at approximately 2:55 p.m. through the Rotunda

Doors, on the east side of the building:





Ex. 19-20.

      C.      In the hours and days following January 6, Fisher did not manifest any regret over

his participation in the riot; to the contrary, he repeatedly celebrated the riot's violence.  On January

7, for example, Fisher was asked on Facebook, "Did you get to the frontlines?"  Fisher's responses included:

> I was there … [I]t was awesome[.] … [I]t was dangerous and violent[.] … [P]eople died … but it was fucking great if you ask me … [I] got tear gassed and pepper sprayed[.]  [S]eeing cops literally run … was the coolest thing ive ever seen in my life[.]
>
> [I] cant divulge too much here[,] … but fuck the dc police[.]
>
> [I]n all seriousness get ready … get in shape and see if you can find someone that knows medical/veteran w/ combat experience[.] … it very likely will come down to we the non faggoty people doing shit[.]

Ex. 21.

In a video that he later posted online, Fisher again discussed his participation in the riot. Ex. 22.  Fisher stated, among other things, that he saw smoke grenades and tear gas and then "found [himself] talking shit" to "cops in riot gear."  *Id.* at 1:10 – 1:30.  Fisher bragged that he told the officers, "Hey, dude, … who pays your fucking salary, you schmuck?  … The American taxpayers. Why are you defending a fraudulent election?"  *Id.* at 1:30 – 1:40.  Fisher also claimed that the officers "actually looked mostly scared, to be honest with you," *id.* at 1:55 – 2:00, and that "[o]ur goal was to get into Congress to fucking question these people that supposedly … represent us." *Id.* at 2:25 – 2:35.  In the same video, Fisher also boasted, "The cops were launching riot shit at us, tear gas.  I got tear gassed, I got pepper sprayed.  And it got fucking crazy, dude.  We shoved our way in there, and we started breaking down doors and shit. … It was a very, very dangerous situation.  Very dangerous."  *Id.* at 2:35 – 3:40.

### The FBI's Investigation and Defendant's Interview

Following the events of January 6, the FBI began an investigation into Fisher's participation in the attack on the Capitol.  On January 20, 2021, the United States Attorney's Office for the District of Columbia charged Fisher by criminal complaint with violating 18 U.S.C.

§§ 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D).  On the same day, law enforcement officers arrested Fisher in New York City.  The FBI also obtained and executed warrants to search the New York City apartment where Fisher was staying and Fisher's car (a 1997 green Chevy Tahoe).   In the apartment, the officers found, among other items,  an AR-15 semi-automatic rifle, a pistol, a machete-style knife, several pre-loaded magazines, and ammunition.  In the Chevy Tahoe, they found more ammunition, a shotgun, shotgun shells, a tactical vest, an AR-style lower receiver, a rifle foregrip light, two machetes, and a knife.

After being advised of and waiving his *Miranda* rights, Fisher gave a voluntary post-arrest interview to the FBI.  During the interview, he admitted traveling to Washington, D.C. to attend the Stop the Steal rally and to protest the outcome of the 2020 Presidential Election.  Fisher stated that he left early from the rally to get something to eat, but then followed the crowd as it marched toward the Capitol.  He also told the officers that, once he arrived at the Capitol, "all of a sudden, flash bangs were going off, and all this crazy stuff."  In response to an agent's question whether Fisher entered the Capitol building, Fisher responded that he went as far as "the top part, … right where the marble starts" but that he did not get past that point.  Fisher denied participating in "anything violent" at the Capitol, though he admitted haranguing the officers about their complicity with the allegedly fraudulent election.

The FBI also asked Fisher about the firearms they had just seized from him earlier that day. Fisher claimed that he had the firearms with him in New York City because he was in between apartments and had nowhere to store them.  Fisher denied bringing any firearms into Washington, D.C. when he visited the District on January 6.  But Fisher also claimed, falsely, that he did not bring any firearms into the Airbnb where he was staying in Hyattsville, Maryland.  Fisher had no

plausible explanation for the fact that, on January 5, he sent a photograph of his firearms in the Hyattsville Airbnb where he was staying.

*The Charges and Plea Agreement*

Following Fisher's arrest, a magistrate judge in the Southern District of New York ordered Fisher detained, finding that no conditions of pretrial release would reasonably assure Fisher's appearance for trial and the safety of the community.  On February 19, 2021, Fisher was charged by information with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One), and disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two).  With those federal charges pending, Fisher was charged in New York state court with four violations of New York's firearm laws: second-degree criminal possession of a weapon, in violation of N.Y. Penal Law § 265.03(3); third-degree criminal possession of an assault weapon, in violation of N.Y. Penal Law § 265.02(7); third-degree criminal possession of a large-capacity magazine, in violation of N.Y. Penal Law § 265.02(8); and criminal possession of an unregistered firearm, in violation of N.Y. Penal Law § 265.01-b.

On March 12, 2021, Magistrate Judge Zia M. Faruqui ordered Fisher released pending trial in this Court, and Fisher was detained to face the charges pending in New York.  On February 28, 2022, Fisher pleaded guilty in New York state court to second-degree criminal possession of a weapon (i.e., a loaded firearm) pursuant to a plea agreement.  On April 4, 2022, a New York judge sentenced him to 3 years and 6 months of incarceration, to be followed by 3 years of supervised release.  Fisher is currently serving that sentence.  According to the New York Department of Corrections and Community Supervision's website, Fisher's earliest release date is March 29, 2025.

16

On July 6, 2022, Fisher pleaded guilty pursuant to a plea agreement to Count One of the Information in this case, which charged him with Entering and Remaining in a Restricted Building or Grounds.   Under the plea agreement, Fisher also agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Fisher now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).   As noted in the plea agreement and by the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000.  He must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-1079 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Fisher's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | 2 |
| Acceptance of Responsibility (USSG § 3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* PSR at ¶¶ 31-38.

The U.S. Probation Office calculated Fisher's criminal history as a category II, which is not disputed.  PSR at ¶ 41. Accordingly, the U.S. Probation Office calculated Fisher's total adjusted offense level, after the acceptance of responsibility adjustment, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months of imprisonment.  PSR at ¶ 78. Fisher's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.  *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).

> Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide a helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that have been or will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.        Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a)

factors weigh in favor of 120 days of imprisonment, to be followed by one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.  Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air (as Fisher says he did in this case).  Indeed, in this case, Fisher repeatedly acknowledged that he was, at a minimum, aware of the riot's violent nature as he entered and remained within the Capitol's restricted grounds.  No rioter was a mere tourist that day.

Additionally, while assessing Fisher's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant anticipated, prepared for, or encouraged violence; (3) whether the defendant encouraged property destruction; (4) how the defendant responded to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on

social media, both before and after the attack; (8) whether the defendant cooperated with, or ignored, commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are neither exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Had Fisher personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct.  The absence of violent or destructive acts on the part of Fisher is therefore not a mitigating factor in misdemeanor cases.

Fisher was prepared for violence when he traveled to Washington, D.C.  He brought at least two firearms—an AR-15 semi-automatic rifle and a pistol—on his trip to the Washington, D.C. area and photographed those weapons while staying in an Airbnb in Hyattsville, Maryland. In the days and hours leading up to January 6, Fisher also escalated the incendiary, violent rhetoric that already pervaded his social-media messages and postings.  On December 30, Fisher invited another Facebook user to join him on his upcoming trip to Washington, D.C., encouraging his friend to come armed: "just march on DC on the 6th … [B]ring ur guns sr … I'll be there man … if you wanna roll with[.]  [Y]ou have firearms? … [I]'d exercise my 2A legal rights there."  Ex. 8. In another message, in the evening of January 5, Fisher lamented, "If millions of patriots don't show up with guns … Srs … [i]t could be over[.]"  Ex. 9.  Later that evening, Fisher sent the same Facebook user a photograph of his firearms from his Hyattsville Airbnb:



Ex. 11.  Fisher then spelled out, in chilling detail, his apparent plan for the next day: "I'm Going

To the parking garage super early … Leaving shit in there maybe except pistol … And if it kicks

off I got a Vest and My Rifle."  *Id.*  And Fisher made his willingness to engage in violence on

January 6 equally clear in an entry he publicly shared on his website around the same time:

> I am writing this from my Air B n B in Washington D.C. …
>
> If there are over 1 million patriots that show up tomorrow for trumps
> 11AM speech.  At 1 when congress certifies the election. … Trump
> just needs to fire the bat signal … deputize patriots … and then the
> pain comes.  1 Million Pissed off men with guns … bad idea.  We
> aren't looking to fight or hurt anyone … but the odds that this is
> going to be solved any other way … is next to nothing[.]

Ex. 12 (formatting altered).  These facts are important because they show a substantial amount of preparation for violence by Fisher.  They also establish both that Fisher understood the role of Congress' certification of the Electoral College in the peaceful transfer of powers between Presidents and that Fisher was determined to impede that transition.

By the time Fisher arrived at the Capitol on January 6, there could be no doubt that the riot had turned violent and dangerous.  As Fisher told the FBI after his arrest, "all of a sudden, flash bangs were going off, and all this crazy stuff."  In a video he recorded on or about January 7, Fisher claimed that he saw both "smoke grenades" and "tear gas."  Ex. 22.  Despite the mayhem, Fisher did not turn back.  To the contrary, as Fisher would later boast (albeit possibly inaccurately), "We shoved our way in there, and we started breaking down doors and shit. … It was a very, very dangerous situation.  Very dangerous."  *Id.* at 2:35 – 3:40.  While at the Capitol, again according to Fisher's post-riot statements, Fisher "found [himself] talking shit" to "cops in riot gear."  *Id.* at 1:10 – 1:30; *see also id.* at 1:30 – 1:40 (bragging that Fisher told the officers, "Hey, dude, … who pays your fucking salary, you schmuck?  … The American taxpayers.  Why are you defending a fraudulent election?").  Not only is the conduct described in Fisher's video abhorrent; the very fact that Fisher recorded and shared the video demonstrates that he was proud of his actions on January 6 and of the actions of those who participated in the riot.

Fisher entered the Capitol Building at approximately 2:37 p.m. through the Memorial Door, on the east side of the Capitol building.  While police officers did  not block his path, the scene outside the Capitol, which Fisher saw and himself described, made abundantly clear that his entry was unlawful.  Indeed, Fisher's own lack of candor when he discussed his whereabout with the

FBI[2] confirms his consciousness of guilt.  Nor did Fisher stop at the Memorial Door, or even at the first floor of the Capitol building.  Instead, Fisher made his way to the second floor of the Capitol, walked in and out of the Rotunda, and spent several minutes in the surrounding areas.  He then strolled through the lobby area between the Rotunda and Rotunda Doors, before finally exiting the building at approximately 2:55 p.m.

The nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Fisher's History and Characteristics

The defendant is 34 years old and enjoys good physical health.  He grew up in a "normal upper middle class household," where he had the opportunity to play various sports, including soccer, basketball, football, boxing, and mixed martial arts.  The defendant also plays the piano, cello, and guitar.  After graduating high school, Fisher enrolled at Pace University but dropped out in his first year.  By any objective measure, as a youth, Fisher enjoyed the material opportunities and privileges of an upper middle-class upbringing.  The fact that, despite all these opportunities, Fisher chose to seek out lawlessness and political violence renders his conduct more, not less, troubling.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]  As with

---

[2]     As noted, in his interview with the FBI, Fisher falsely denied that he entered the Capitol building.

[3]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House

the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, No. 1:21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  As this Court has recognized, "[f]uture would-be rioters must be deterred."  *United States v. Thomas Gallagher*, 1:21-cr-41 (CJN) Tr. 10/13/2021 at 37.

General deterrence is an important consideration because many of the rioters, including Fisher, intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected

---

Oversight     and     Reform     Committee     (June     15,     2021),     available     at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20
Testimony.pdf

President.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, No. 1:21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, No. 1:21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Fisher's statements after January 6 confirm the need for specific deterrence for this defendant.  As described in more detail above, in the hours and days after January 6, Fisher recorded a video that celebrated the political violence of that day and bragged about Fisher's own contributions to the riot.  Ex. 22.  Similarly, in a Facebook message, in response to the question "Did you get to the frontlines?", Fisher responded, "I was there … [I]t was awesome[.] … [I]t was

dangerous and violent[.] … [P]eople died … but it was fucking great if you ask me … [I] got tear gassed and pepper sprayed[.]  [S]eeing cops literally run … was the coolest thing ive ever seen in my life[.] … [B]ut fuck the dc police[.]"  Ex. 21.  And Fisher expressly encouraged his Facebook friend to "get ready … get in shape and see if you can find someone that knows medical/veteran w/ combat experience[.]"  *Id.*  Fisher's own words—aggravated by Fisher's track record of amassing firearms and other weapons in preparation for an upcoming "civil war"—demonstrate a very real possibility of future political violence.  They impel the government to seek a significant jail sentence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers, to conspiracy to corruptly interfere with Congress.[4]  This Court must sentence Fisher based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.  Although defendants convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[5]  *See United States v. Anna Morgan-Lloyd*, No. 1:21-cr-164

---

[4]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]     Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, No. 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, No. 1:21-cr-97 (PFF); and *United States v. Donna Sue Bissey*, No. 1:21-cr-165 (TSC).  The government is abiding by its agreements in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a

(RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). *Accord United States v. Valerie Ehrke*, No. 1:21-cr-97 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Fisher pleaded guilty to Count One of the Information, which charged him with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).  This offense is a Class A misdemeanor. 18 U.S.C. § 3559.  Although all the defendants discussed below participated in the events of January 6, 2021, many salient differences—including Fisher's preparations for violence, the fact that Fisher brought firearms to the Washington, D.C. area (albeit apparently not into the District or to the Capitol), and Fisher's chilling glorification of armed political violence—explain the differing recommendations and sentences.  And avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases, like this one, for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United*

---

"fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for offenses related to the January 6 attack on the Capitol constitute an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should consider the sentences imposed in cases that present the two defining features present here: (i) Fisher's involvement with firearms in preparing for political violence; and (ii) Fisher's glorification of political violence even after January 6.

Judges in this district have imposed appropriately severe sentences on defendants who injected firearms in their preparations for the January 6 attack.  This Court may consider, for reference, the sentence of Leonnie Leroy Coffman.  *See United States v. Coffman*, No. 21-cr-4 (CKK).  Leonnie Coffman drove a pickup truck that contained a nine-millimeter handgun, a rifle, and a shotgun, among other weapons, from his home state of Alabama to Washington, D.C., and parked it only blocks away from the Capitol.  Also inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars filled with potentially incendiary contents, and other items.  When Coffman left his pickup truck on the morning of January 6, he carried two loaded firearms on his

person around Washington, D.C.  For his conduct on January 6, Coffman pleaded guilty to possessing an unregistered firearm (destructive device), in violation of 26 U.S.C. § 5861(d), and to carrying a pistol without a license, in violation of 22 D.C. Code 4504(a).  The district court sentenced him to 46 months of incarceration.  *See United States v. Coffman*, No. 1:21-cr-4 (CKK) (Apr. 26, 2022).

Coffman's conduct was, admittedly, substantially more culpable than Fisher's.  Among other distinctions, there is no conclusive evidence that Fisher brought his firearms into Washington, D.C. (as opposed to his Airbnb in Hyattsville, Maryland), and the arsenal found in Coffman's truck was more disturbing in nature and extent than the firearms Fisher photographed in his Hyattsville Airbnb.  Coffman, accordingly, faced more severe charges and penalties than Fisher faces in this case.  Still, the fact that Coffman received a 46-month prison sentence for his involvement with firearms in connection with the January 6 attack supports the conclusion that Fisher's case lies, at a minimum, at the aggravated end among January 6 misdemeanor defendants.

This Court may also consider the sentence it imposed in *United States v. Clifford James Meteer*, No. 1:21-cr-630 (CJN).  Meteer pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a lesser (Class B) misdemeanor than the Class A misdemeanor to which Fisher has pleaded guilty in this case.  Similarly to Fisher, Meteer entered the Capitol and remained inside for a substantial period (31 minutes); made statements on Facebook after January 6 that revealed a lack of remorse; and unlawfully possessed 10 firearms and several rounds of ammunition in his home.[6]  This Court sentenced Meteer to 60 days of imprisonment, to be followed by 36 months of probation.  Fisher's conduct warrants a

---

[6]     As a convicted felon, Meteer was prohibited from possessing the firearms anywhere.  There is no indication that Meteer brought any firearms to the Capitol or the Washington, D.C. area on January 6.

more severe punishment in this case.  Whereas Meteer left his guns at home in Tennessee, Fisher brought a semi-automatic rifle and a pistol on his trip to the Washington, D.C. area (though apparently not into the District); photographed those firearms in his Hyattsville Airbnb on the eve of January 6; and claimed in a Facebook message that he planned to have the firearms at the ready in his car the following day as he went into the District.  Furthermore, as noted, Fisher pleaded guilty to a more serious Class A misdemeanor.  Meteer's sentence thus supports a 120-day sentence in this case.

In addition, this Court may consider, for reference, the sentence of Adam Avery Honeycutt.  *See United States v. Honeycutt*, No. 1:22-cr-50 (CJN).  Honeycutt pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G)—the same Class B misdemeanor as in *Meteer*.  Like Fisher, Honeycutt witnessed the violence that occurred outside the Capitol building.  Like Fisher, Honeycutt glorified the rioters' confrontations with police on social media—Honeycutt by posting pictures and Fisher by posting the video he recorded on or about January 7.  Like Fisher, Honeycutt mocked the vastly outnumbered police officers who were trying to defend the Capitol—Honeycutt by claiming the officers were "hiding" and Fisher by writing that "seeing cops literally run … was the coolest thing ive ever seen in my life[.]"  Finally, while Honeycutt helped the rioters who were violently battling the police in the Lower West Terrace Tunnel (by passing a wooden plank to other rioters), Fisher at one point bragged that "[w]e shoved our way in there, and we started breaking down doors and shit."[7]  For his conduct on January 6, Honeycutt received a sentence of 90 days, to be served consecutively to a sentence Honeycutt was serving on firearms charges.  Considering Fisher's significantly more

---

[7]     The government has not been able to independently verify the veracity of Fisher's statements regarding his participation in acts of violence.

serious conduct—especially the fact that Fisher brought firearms on his trip to the Washington, D.C. area and glorified armed political violence in the early hours of January 6—a sentence of 120 days is appropriate in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## VI.    Fisher's Term of Imprisonment Should Run Consecutively to His State Sentence

Any term of incarceration imposed in this case should run consecutively to the prison sentence the defendant is currently serving for his conviction on New York firearm charges. Section 3584(a) of Title 18 provides that, with exceptions not relevant here, "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively."   18 U.S.C.  § 3584(a). Subsection 3584(b) further provides that, "in determining whether the terms imposed are to be ordered to run concurrently or consecutively," courts "shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."  18 U.S.C.

§ 3584(b).  The presumption is that "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."  18 U.S.C. § 3584(a).

Consistent with 18 U.S.C. § 3584(a), Section 5G1.3 of the Sentencing Guidelines provides that, if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction," the sentence for the instant offense should be adjusted to avoid double-counting.  U.S.S.G. § 5G1.3(b).  Otherwise, "the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."  U.S.S.G. § 5G1.3(d); *see also id.* app. note 4(A) (identifying potentially relevant factors).

Fisher's participation in the January 6 attack warrants a consecutive sentence in this case. As a threshold matter, nothing in the Guidelines requires Fisher's sentence in this case to run concurrently to his New York sentence.  Fisher's New York sentence did not result from an offense that is "relevant conduct" to the instant offense under the Sentencing Guidelines.   U.S.S.G. § 1B1.3(a)(1).  In the New York prosecution, Fisher was charged, convicted, and sentenced for unlawfully possessing certain firearms in violation of New York law in New York City on January 20, 2021.  Fisher's unlawful possession of a weapon in New York City on January 20, 2021—two weeks after the instant offense was complete—does not constitute "relevant conduct" to the offense now before the Court: Fisher's unlawful entry in a restricted building or grounds in Washington, D.C. on January 6, 2021.  *See* U.S.S.G. § 1B1.3(a)(1).

Applying U.S.S.G. § 5G1.3(d), this Court should conclude that a consecutive prison term is necessary "to achieve a reasonable punishment" for Fisher's participation in the January 6 riot. U.S.S.G. § 5G1.3(d).  Fisher's participation in the January 6 attack was not merely a bad choice

33

that led the police to discover the firearms he was unlawfully possessing in New York on January 20, 2021. As explained above, his participation in the riot was—and remains—a serious criminal offense that struck at the heart of the peaceful transfer of powers after the 2020 Presidential Election. It was—and remains—worthy of incarceration in itself. Cf. *United States v. Sobin*, 56 F.3d 1423, 1430 (D.C. Cir. 1995) (applying U.S.S.G. § 5G1.3(c) and concluding that, "[b]ecause the five sexual offense sentences [imposed by a state court] did not result at all from conduct taken into account [in the instant federal bankruptcy fraud prosecution], the district court properly imposed fully consecutive sentences as 'reasonable incremental punishment' for the instant offenses").

Indeed, this Court has already reached the same conclusion under analogous circumstances in *Honeycutt*. In *Honeycutt*, a search of the defendant's residence in Florida at the time of his arrest on January 6-related charges led to the discovery of several firearms that Honeycutt, who was an unlawful user of marijuana, could not lawfully possess. *Honeycutt*, No. 1:22-cr-50, ECF No. 38 at 25-26; ECF No. 41 (CJN). Honeycutt pleaded guilty to an unlawful firearm possession charge, and a district court in Florida sentenced him to 18 months of imprisonment on that charge. Honeycutt then pleaded guilty to violating Section 5104(e)(2)(G) for his actions on January 6. At sentencing, this Court imposed a term of 90 days' imprisonment, to be served consecutively to Honeycutt's 18-month sentence for his firearm conviction. Nothing warrants taking a different approach and making Fisher's sentence concurrent to his New York sentence in this case.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Fisher to 120 days of incarceration to be served consecutively to Fisher's New York sentence; one year of supervised release; 60 hours

of community service; and $500 in restitution.  Such a sentence protects the community, promotes

respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence

of his behavior, while recognizing his acceptance of responsibility for his crime.


September 30, 2022                    Respectfully submitted,

                                     MATTHEW M. GRAVES
                                     UNITED STATES ATTORNEY
                                     D.C. Bar No. 481052

                          By:        */s/ Francesco Valentini*
                                     Francesco Valentini
                                     D.C. Bar No. 986769
                                     Trial Attorney
                                     United States Department of Justice
                                     Criminal Division, Appellate Section
                                     Detailed to the D.C. United States Attorney's Office
                                     601 D Street NW
                                     Washington, D.C. 20530
                                     (202) 598-2337
                                     francesco.valentini@usdoj.gov